USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 08/26/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PNC BANK, N.A. et al.,

                              Plaintiffs,

                    v.

DANA TRANSPORT, INC. and
RONALD B. DANA,

                              Defendants.

No.  16-CV-7797 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiffs PNC Bank, National Association; Wells Fargo Capital Finance, LLC; Wells Fargo Bank, National Association; BMO Harris Bank; Huntington National Bank; Cathay Bank; and Bank Leumi, USA (collectively, "Plaintiffs" or "Lenders") are a syndicate of banks that had varying participation interests in a loan facility that was provided to Ronald B. Dana and his company, Dana Transport, Inc. (collectively, "Defendants" or "Dana").  Pursuant to the terms of the loan agreement between the parties, Dana is obligated to indemnify Plaintiffs for attorneys' fees that Plaintiffs incur in any action initiated by Dana that is related to the loan agreement.

Plaintiffs filed this suit in 2016, alleging that Dana owed them attorneys' fees that they had incurred in defending an action Dana had brought in this District in 2015.  Now before the Court are three motions for partial summary judgment, in which Plaintiffs seek a ruling that Dana is liable for those fees.  For the reasons that follow, the motions are granted.[1]

---

[1] The Court also grants the parties' joint request to seal Exhibits 6, 7, and 8 to the Declaration of Joshua Peles for the reasons expressed in the parties' letter motion.

**BACKGROUND**

The Court assumes the parties' familiarity with the factual and procedural history of this case, and therefore discusses only those facts that are necessary to resolve the instant motions.

## I.    Factual Background

Ron Dana is the founder, president, and sole owner of Dana Transport, Inc., a company that transports bulk liquid materials. Dana's 56.1 ¶ 302.[2]  Around March 15, 2004, Dana Transport entered into a $20 million line of credit and security agreement with PNC Credit (the asset-based lending group of PNC Bank, N.A.), which was secured by Dana's trade receivables. PNC's 56.1 ¶ 1.  Around January 26, 2006, this line of credit was superseded by a syndicated $135 million loan facility (the "2006 Loan Agreement"). *Id.* ¶ 2.  PNC served as the agent for the lending group in connection with the 2006 Loan Agreement. *Id.* ¶ 4.  Advances under the 2006 Loan Agreement were to be secured by, among other things, Dana's rolling stock (including the vehicles in the company's fleet). *Id.* ¶ 8.  In connection with the 2006 Loan Agreement, PNC and Dana entered into a fixed interest rate swap transaction. Dana's 56.1 ¶ 332.[3]  Also in connection with the 2006

---

[2] Unless otherwise noted, citations to paragraphs of a party's Rule 56.1 statement encompass citations to the exhibits cited in those paragraphs.

Additionally, while the Court declines to strike Dana's Rule 56.1 statement, as Lenders request, Dana's legal arguments that are made in that statement and in its counterstatements to Lenders' 56.1 statements are impermissible and will thus be disregarded. *See Simmons v. Woodycrest Ctr. for Human Dev., Inc.*, No. 10-CV-5193 (JSR), 2011 WL 855942, at *1 n.1 (S.D.N.Y. Mar. 9, 2011) (disregarding a Rule 56.1 statement in part because several of its purported facts were "legal conclusions").  Specifically, Dana either denies or admits with clarification many statements of fact in Lenders' 56.1 submissions—but disputes those facts solely on the basis of legal arguments, rather than based on competing evidence. *See, e.g.*, Dana's Counterstatement to PNC's 56.1 ¶¶ 17, 20, 21, 22, 25, 26, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 77, 82, 83, 84, 87, 88, 89, 90, 91, 92, 93, 94, 95, 97, 98, 99, 101, 102, 104, 105, 107, 108, 116, 122, 127, 128, 130, 132, 133, 134, 135, 136, 137, 138, 144, 147, 153, 155, 157, 158, 160, 163, 164, 166, 167, 168, 170, 171, 172, 174, 176, 178, 179, 180, 181, 182, 183, 185, 186, 187, 188, 190, 191, 192, 193, 195, 196, 197, 198, 200, 201, 202, 203, 205, 206, 207, 208, 210, 211, 212, 213, 215, 216, 217, 221, 223, 236, 237, 238, 239, 241, 244 (disputing statements regarding the contents of or circumstances surrounding various agreements solely on the basis that the agreements are not binding on grounds of duress or on other legal grounds); *id.* ¶¶ 40, 41, 42, 43, 44, 45, 46, 47, 49, 50, 51, 53, 54, 59, 61, 62 (disputing whether Dana defaulted under certain agreements based solely on legal arguments regarding the materiality of the default).  Such arguments will be disregarded for the purpose of deeming whether a particular fact is admitted.

[3] According to Dana, a "fixed-rate Swap is a form of a derivative contract wherein floating rate debt is 'swapped' for

Loan Agreement, Ron Dana signed a personal guaranty for $12 million; it appears that this guaranty was intended to cover a collateral shortfall that resulted from purported deficiencies in Dana's motor vehicle titles that were discovered following a third-party appraisal. PNC's 56.1 ¶ 6; *see* Cecchi Dec. Ex. 6 at 2 (PNC memorandum dated January 23, 2006 explaining that "Ron Dana will personally guaranty the deficiency until all titles are delivered and in proper form"). Dana's CFO testified both personally and in his capacity as Dana's 30(b)(6) representative that he did not find any terms of the 2006 Loan Agreement to be unusual or unfair. PNC's 56.1 ¶¶ 11, 12; *id.* Ex. 4 at 41:14-25; 43:3-17; *id.* Ex. 6 at 56:25-58:20.

On June 29, 2007, the parties signed a Second Amended Loan Agreement that superseded the 2006 Loan Agreement. PNC's 56.1 ¶ 13. At some point during this period, PNC again appraised the value of Dana's rolling stock through a third party's services. Following this second appraisal, PNC determined that over 1,000 units of stock with an approximate liquidation value of $26 million did not have proper title documentation and thus excluded them from the appraisal. *See id.* ¶ 55. As will be discussed later, the parties dispute whether the title deficiencies and resulting collateral shortfall were the result of PNC's errors, Dana's errors, or PNC's deliberate actions. Ron Dana executed an amended personal guaranty to compensate for this additional shortfall, which increased his maximum personal obligation to $14 million. *Id.* ¶¶ 17, 24. The guaranty held him liable for all sums for which Dana Transport might become liable under the loan agreement, and provided that it would remain in effect until all Dana's obligations under the loan agreement were paid in full. *Id.* ¶¶ 23, 26. In connection with the Second Amended Loan

---

a fixed rate. In simple terms, the borrower's interest payment obligation is fixed for a specific term of months (in this case, 60 months). If, during the term of the loan, the underlying Libor index rises above the start rate, the investor or purchaser of the Swap contract (the 'Counterparty') covers the difference—allowing the borrower to maintain a fixed rate payment. In the alternative (as predominantly was the case here), if the underlying floating index falls below the start rate, the borrower covers both the indexed floating rate in addition to paying the Counterparty the difference in spread—thus, maintain the fixed payment amount." *Id.* ¶ 309.

Agreement, on May 17, 2007 the parties entered into a new swap transaction. *Id.* ¶ 32.  Dana's CFO testified both personally and in his capacity as Dana's 30(b)(6) representative that he did not find any terms of the Second Amended Loan Agreement to be unusual. *Id.* ¶¶ 27, 28; *id.* Ex. 4 at 85:15-87:19; *id.* Ex. 6 at 77:17-79:22.

According to Lenders, Dana failed to comply with certain financial covenants in the Second Amended Loan Agreement by not maintaining a specified fixed charge coverage ratio and by not maintaining a specified ratio of funded debt to EBITDA (earnings before interest, taxes, depreciation, and amortization). *Id.* ¶¶ 37-38, 43-46, 49-50, 53-54, 61-62.  Under the contract, these failures constituted an event of non-monetary default, *id.* ¶ 40—and thus allowed Lenders to raise the interest rate to a default interest rate, declare all obligations immediately due, cease making advances, and terminate the agreement, *id.* ¶¶ 41-42.  According to Dana, Lenders' assertions of default were "based on a miscalculation which ignored the return to the Borrowers of $10 million as part of the Second Amended Loan Agreement," Dana's Counterstatement to PNC's 56.1 ¶ 43; Dana thus maintains that it was "in fact in compliance during this period," *id.* The pages of the deposition transcript to which Dana cites in support of this assertion, however, do not appear in the corresponding exhibit. *See* LaSala Dec. Ex. W (excerpted deposition transcript that does not contain pages 135-36).  PNC notified Dana of its noncompliance with the Second Amended Loan Agreement for the periods ending on December 31, 2007, March 31, 2008, June 30, 2008, and September 30, 2008 in at least three separate communications; each time, PNC notified Dana that Lenders were reserving their rights and remedies under the agreement.  PNC's 56.1 ¶¶ 47, 51, 59.

On February 27, 2009, the parties entered into a Forbearance and Amendment Agreement. *Id.* ¶ 64.  In that agreement, Dana acknowledged it had defaulted, that any cure periods had expired,

that Dana was obligated to pay all obligations owed, and that Lenders had no obligations to make further advances.  *Id.* ¶¶ 69-70.  Dana also agreed to hire a turnaround consultant.  *Id.* ¶ 72. Lenders, for their part, agreed to forbear from exercising their rights and remedies until March 31, 2009, at which point they would exercise their rights unless another agreement between the parties was established.  *Id.* ¶ 74.

On April 27, 2009, the parties entered into the Third Amended Loan Agreement (the "TALA").  *Id.* ¶ 77.  The TALA set Dana's credit limit at $125 million; increased Dana's interest rate by setting an additional rate of 4.25% above a 3% Libor floor on top of the interest rate set in the 2007 swap agreement; reiterated Dana's obligation to hire a consultant; demanded additional collateral from Dana in the form of real estate; and required Dana to maintain similar financial covenants as those in the Second Amended Loan Agreement starting March 31, 2010.  *Id.* ¶¶ 84, 86, 88, 89, 90; Dana's Counterstatement to PNC's 56.1 ¶ 86.  Ron Dana reaffirmed his personal guaranty on April 27, 2009.  PNC's 56.1 ¶ 102.

The TALA also contains the indemnification provision at the heart of this case.  That provision reads, in pertinent part, as follows:

> Indemnity. Each Borrower shall indemnify Agent, each Lender and each of their respective officers, directors, Affiliates, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever **(including, without limitation, fees and disbursements of counsel)** which may be imposed on, incurred by, or asserted against Agent or any Lender in any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Agent or any Lender is a party thereto, **except to the extent that any of the foregoing arises out of the willful misconduct of the party being indemnified** (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

McTernan Dec. Ex. WF006 ("TALA") § 16.5 (emphases added).

5

Under the TALA, Dana was required to provide PNC with various documents concerning the new real estate collateral, including title policies, appraisals, and studies and reports.  PNC's 56.1 ¶ 91.  Dana failed to provide those documents by the designated date, which, as Lenders informed Dana, constituted an event of default under the TALA.  *Id.* ¶¶ 92, 117-21, 122, 127. Additionally, Dana continued to fail to maintain the financial covenants that had been carried over into the TALA (*i.e.*, maintaining a specified fixed charge coverage ratio and specified funded debt to EBITDA ratio) and failed to deliver other required documentation.  PNC issued at least eleven notices to Dana regarding such noncompliance with the TALA between June 2009 and March 2012.  *Id.* ¶¶ 140-44, 149-53, 155, 157-58, 160-61, 163-64, 166-68, 170-72.  Between June 2010 and January 2013, the parties also entered into multiple waivers, forbearances, and/or amendments to the TALA in which Lenders agreed, among other things, to waive certain events of default in exchange for certain concessions and releases from Dana.  *See id.* ¶¶ 130, 132-35, 174-76, 178-80, 183-85, 188-90, 193-95, 198-200, 203-05, 208-10, 213-15.

On January 29, 2013, the lending relationship ended when Dana refinanced its debt with non-party lenders, and the parties executed a payoff letter that day.  *Id.* ¶¶ 218, 221.

It is undisputed that both Dana Transport and Ron Dana consulted with counsel in connection with the various contracts executed between the parties, and that counsel performed nearly 500 hours of work in connection with the transactions described above solely during the period spanning March 10, 2009 to April 30, 2009.  *Id.* ¶¶ 15, 19, 66, 95, 96, 104, 107, 136, 181, 186, 191, 196, 201, 211, 216, 223.

## II.    Procedural History

On October 8, 2015, Dana filed an action in this District against Lenders ("*Dana I*"), raising RICO claims, contract claims, and tort claims arising from the lending relationship between the

6

parties.  Nicholas Dec. ¶ 3; *see Dana Transport, Inc. et al. v. PNC Bank, N.A. et al.*, No. 15-CV-7954 (CM).  Dana voluntarily dismissed *Dana I* in December 2015, before any motion practice or merits rulings had occurred.  Despite the short lifespan of *Dana I*, Lenders incurred least $246,704.38 in defending that action before it was dismissed.  Nicholas Dec. ¶ 7.  On September 1, 2016, counsel for PNC, on behalf of Lenders, sent a demand letter requesting that Dana indemnify Lenders against those fees pursuant to the TALA and that Ron Dana honor his personal guaranty.  *Id.* ¶ 6.  To date, neither Dana Transport nor Ron Dana have indemnified Lenders.  *Id.* ¶ 8.  Lenders thus filed the instant action on October 5, 2016.

On April 6, 2016, Dana filed a second lawsuit against Lenders and several other entities, this time in New Jersey state court ("*Dana II*").  BMO's 56.1 ¶ 45; *see Dana Transport, Inc., et al. v. PNC Bank, N.A., et al.*, No. MID-L-2095-16.  In *Dana II*, Dana again raised contract and tort claims arising from the parties' lending relationship.  One of Lenders' counterclaims in that suit is for indemnification pursuant to the TALA.  *See* Dec. 20, 2021 Letter at 3.  *Dana II* remains pending, but it is unclear if and when the New Jersey court will rule on the enforceability of the indemnification provision, either as applied to the fees incurred in *Dana II* or as applied to fees incurred in any other litigation.

On September 22, 2017, this Court denied Dana's motion to dismiss or, in the alternative, to stay the case pending resolution of *Dana II*.  As relevant here, the Court held that it was "unmistakably clear" that section 16.5 of the TALA required Dana to indemnify Lenders for "attorneys' fees incurred by them in litigation instituted by Dana Transport Incorporated, as was *Dana I*."  2017 Oral Ruling Tr. at 42:24-43:2.  In so doing, it found that Dana qualified as a "person" under the TALA, such that litigation that was "instituted or conducted by" Dana qualified as litigation that was subject to the indemnification provision.  *See id.* at 42:9-22.  The Court also

7

declined to stay proceedings, concluding that neither the *Colorado River* doctrine nor concerns of judicial economy justified such a stay given the differences between the claims in this case and those in *Dana II*. *See id.* at 44:10-47:4.

Following the Court's 2017 ruling, Lenders moved for judgment on the pleadings. In addressing this motion, the Court noted that it was "sympathetic to Plaintiffs' position especially in light of [its prior] ruling that the language of the loan agreement is so clear." 2018 Oral Ruling Tr. at 20:15-17. But notwithstanding Plaintiffs' "very strong case," the Court felt compelled to deny judgment on the pleadings because Dana had raised "bare-boned" affirmative defenses of duress and willful misconduct—either of which, if proven true, would render the indemnification provision unenforceable. *See id.* at 20:19-24, 21:24-25. The Court also rejected the argument that the relevant finding of willful misconduct could have been made only by the court in *Dana I*. *See id.* at 21:15-22.

These motions for partial summary judgment followed.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* Once the moving party has met its initial burden, the burden shifts to the opposing party to "set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).[4] Accordingly, the non-movant must come forward with enough evidence "on

---

[4] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, alterations, and footnotes.

which the jury could reasonably find [in their favor]." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.  The Court must "constru[e] all the evidence in the light most favorable to the non-movant and draw[] all reasonable inferences in that party's favor." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014).

## DISCUSSION

To prevail on their motions for partial summary judgment, Lenders must show that there is no genuine issue of fact as to the existence of a contract that imposes on Dana an indemnification obligation; Lenders' performance under that contract; and Dana's failure to pay Lenders for fees they incurred and paid to third parties that are subject to the indemnification obligation.  *See Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 126 (2d Cir. 2019).  There is no dispute in this action as to the existence of the TALA, which contains the relevant indemnification provision; that Lenders performed under the TALA by advancing funds to Dana; and that Dana has failed to indemnify Lenders for attorneys' fees they incurred in connection with *Dana I*, notwithstanding this Court's prior ruling that those fees are subject to the indemnification provision.  Rather, Dana's sole defenses to liability consist of its challenges to the enforceability of the TALA and its indemnification provision; namely, its arguments that the TALA is unenforceable in its entirety because Dana signed it under duress, and that Dana has no duty to indemnify Lenders because they committed "willful misconduct," as that term is defined in the indemnification provision's carveout clause.  Neither argument has merit.[5]

---

[5] In opposing summary judgment, Dana also attempts to relitigate issues this Court has already decided by arguing that Dana is not a "person" as that term is used in the indemnification provision such that any litigation Dana institutes is not subject to indemnification, and that it is not "unmistakably clear" that the indemnification provision requires Dana to pay Lenders' fees incurred in *Dana I* (absent the presence of an affirmative defense).  The Court already rejected these arguments when it denied Dana's motion to dismiss and finds no reason to revisit its rulings.

I.     **There Is No Genuine Issue of Material Fact as to Whether Dana Was Under Duress**

Dana argues that the TALA—and, indeed, virtually every contract that was signed during the parties' lending relationship—was signed under duress and is thus not enforceable. This argument fails, both because Dana has waived a duress defense and because Dana has failed to present evidence that Lenders ever made a wrongful threat.

As an initial matter, any available duress defense Dana may have had has been waived by its failure to promptly repudiate the TALA. "A party may ratify a contract or release entered into under duress by intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 123 (2d Cir. 2001). Here, Dana signed the TALA, and Ron Dana signed the personal guaranty, in April of 2009, and both accepted those contracts' benefits. Even accepting Dana's argument that it was under continuous duress and thus not in a position to repudiate the agreement until it had exited the lending relationship, *see* Opp. MOL at 53, Dana refinanced with other lenders in January 2013—but failed to raise duress until it filed its complaint in *Dana I* on October 8, 2015. This two-year gap, without any explanation for such delay, constitutes a forfeiture of any duress defense. *See, e.g.*, *VKK Corp.*, 244 F.3d at 123 (noting that "[d]elays as short as six months have been held to constitute forfeiture of the claim" of economic duress); *Dirose v. PK Mgmt. Corp.*, 691 F.2d 628, 633-34 (2d Cir. 1982) (collecting cases in which delays ranging from six months to two years constituted waiver).

Nor could any duress defense, even if not waived, succeed on the merits. "To void a contract on the ground of economic duress, the complaining party must show that its agreement was procured by means of (1) a wrongful threat that (2) precluded the exercise of its free will."

*Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011). *See also Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989) ("New York law . . . establishes the following elements of economic duress: (1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative."). A "mere demonstration of financial pressure or unequal bargaining power will not, by itself, establish economic duress." *Interpharm*, 655 F.3d at 142. Rather, "[t]he law demands threatening conduct that is wrongful, *i.e.*, outside a party's legal rights." *Id.* Accordingly, "a threat to exercise a legal right" in order to "compel the other party to submit to new demands" cannot constitute a wrongful threat. *Id.*

Dana argues that virtually the entire lending relationship between the parties was infected by duress because "Lenders unlawfully threatened Defendants that if they did not sign multiple loan documents and guarantees, Lenders immediately would stop funding the loans, which would have irreparably destroyed the Borrowers' businesses." Opp. MOL at 51. This theory fails, because Dana describes nothing more than Lenders' threats to exercise their legal rights.

The Second Circuit's decision in *Interpharm* is not only instructive, but conclusive, on this issue. In that case, a plaintiff borrower defaulted on a credit agreement with a lender. "Rather than exercise its default remedies," which included termination of funding and acceleration of the borrower's obligations, the lender "entered into a new agreement" with the borrower that increased the line of credit available "in exchange for additional fees and higher interest rates." 655 F.3d at 138. The borrower defaulted on that amended agreement; in response, the lender increased the borrower's "obligations to the default rate and assess[ed] other default penalties," as it was entitled to do under the amended agreement. *Id.* at 139. The borrower's financial situation continued to deteriorate such that the lender refused to advance further funds unless the borrower signed a third

agreement, in which the borrower acknowledged default, agreed to pay additional fees, released all claims, agreed to restrict its borrowing base, and promised to retain a restructuring officer that was acceptable to the lender. *See id.* In exchange, the lender would forbear on exercising its legal rights. *See id.*

After the lending relationship ended, the borrower sued the lender, and argued that the release provisions in their various contracts were unenforceable on the basis of duress. The Second Circuit disagreed, "conclud[ing] that these allegations cannot, as a matter of law, plausibly support a wrongful threat" because the lender never "exceed[ed] its contract rights." *Id.* at 144-45. So too here: when Dana defaulted on the Second Amended Loan Agreement, Lenders had the right to raise the interest rate, cease funding, demand immediate repayment, and terminate the agreement. PNC's 56.1 ¶¶ 41, 42. They cannot be faulted for threatening to exercise those rights unless Dana signed the February 2009 forbearance agreement, and later, the TALA, even if those contracts had terms that were unfavorable to Dana, such as higher interest rates, the obligation to retain a consultant, and burdensome requirements to deliver titles and documents. *Cf.* 655 F.3d at 146 ("[F]aced with a borrower in continued default of its financial covenants, there appears to [be] nothing wrongful in a lender exercising its right to increase its level of security as its borrower becomes less creditworthy.").

Dana's arguments to the contrary are unpersuasive. It contends that Lenders pressured Dana into committing in the TALA to deliver titles by a certain date, despite Dana's protestations to Lenders that it would not be able to meet those deadlines. But *Interpharm* answers this question as well: the Circuit rejected similar allegations by the borrower that it had "little choice" but to sign a contract when it had unsuccessfully "communicated" to the lender that the contract's financial covenants were "unrealistic," "highly uncertain[,] and unreasonable." *See id.* at 144.

Dana also asserts that Lenders' conclusion that Dana had defaulted on the Second Amended Loan Agreement was "based on a miscalculation which ignored the return to the Borrowers of $10 million as part of the Second Amended Loan Agreement," and that "Borrowers were in fact in compliance during this period."  Dana's Counterstatement to PNC's 56.1 ¶ 43.  But even putting aside the fact that Dana has failed to provide evidentiary support for this proposition, there is no indication that Dana ever communicated its belief that it was not in default—to the contrary, Dana affirmed in the February 2009 forbearance agreement that it was in default on its obligations under the Second Amended Loan Agreement, *see* PNC's 56.1 ¶ 69.[6]  Moreover, "[u]nder New York law, threats to enforce a party's legal rights under a contract—*or even that party's interpretation of its rights*—cannot constitute a wrongful threat."  *Cooper Dev. Co. v. Friedman*, No. 92-CV-7572 (JSM), 1994 WL 62846, at *4 (S.D.N.Y. Feb. 22, 1994) *aff'd sub nom. Cooper Dev. v. Friedman*, 43 F.3d 1458 (2d Cir. 1994) (emphasis added).  In other words, even if Lenders' position that Dana was in default was mistaken, its threatened exercise of its rights based on that interpretation—an interpretation that Dana explicitly communicated its agreement with—cannot, without more, be wrongful.

Dana argues more broadly that *Interpharm* does not control because Lenders' threats were unlawful to the extent they were "premised on, *inter alia*, (i) intentional breaches by Lenders of their agreements with the Borrowers . . . and (ii) fraudulent misrepresentations related to the 2007 Swap Agreement."  Opp. MOL at 51.  These arguments, however, implicate Dana's willful misconduct defense—which, as discussed below, also fails.

---

[6] Dana also relies on a New York Appellate Division case stating that while "[a]greements providing for the acceleration of the entire debt upon the default of the obligor are often enforced in accordance with their terms," "where the breach asserted as the basis for the acceleration is trivial or inconsequential, the forfeiture may be viewed as an unconscionable penalty and equitable principles come into play."  *Tunnell Pub. Co. v. Straus Commc'ns, Inc.*, 169 A.D.2d 1031, 1032 (N.Y. App. Div. 1991).  But Dana's repeated breaches of its financial covenants cannot reasonably be characterized as "trivial" or "inconsequential."  And, in any event, Lenders never actually accelerated the debt; they simply declared default.

## II.   There Is No Genuine Issue of Material Fact as to Whether Lenders Committed Willful Misconduct

Dana's second argument against liability is that it is not required to pay the fees that Lenders incurred in *Dana I* because that action, and the fees incurred in defending it, arose "out of the willful misconduct of" Lenders.  TALA § 16.5.  Dana invokes the term "willful misconduct" as a talisman against summary judgment, arguing that determining what the parties to the TALA intended "willful misconduct" to mean is a factual question that cannot be resolved at this stage. Dana is incorrect.  While there is some uncertainty as to the full scope of behavior that is captured by the term "willful misconduct" under New York law,[7] that law also makes clear that "willful misconduct," as used in a contractual limitation of liability provision, is frequently capable of interpretation by courts—and that such "willful misconduct" requires, at the very least, an intentional breach of contract.

For instance, in *Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125 (2d Cir. 2016), the Second Circuit considered a carveout provision very similar to the one at issue here, which stated that a damages cap would apply "[e]xcept for . . . liability arising from gross negligence, recklessness, or willful misconduct."  *Id.* at 137.  In affirming the district court's holding on summary judgment that this carveout did not apply, the Circuit relied on a New York Court of Appeals case interpreting similar language, which concluded that "that the term willful acts as used in [that] contract was intended by the parties to subsume conduct which is tortious in nature, *i.e.*, wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties."  *Id.* at 138 (quoting *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 508 (N.Y. 1994)).  Guided by

---

[7] The TALA contains a valid choice-of-law provision stating that New York law governs any dispute over its interpretation or enforcement.  TALA § 16.1; *see 19 Recordings Ltd. v. Sony Music Ent.*, 97 F. Supp. 3d 433, 438 n.4 (S.D.N.Y. 2015).

this authority, the Circuit held that appellant had failed to present evidence of willful misconduct because it failed to raise a question of fact as to whether a party's conduct "extended well beyond a simple breach of the contract," much less whether it "willfully intended to inflict harm" through any such breach. *See id.* at 140. Other courts have similarly emphasized the strong showing that is necessary to establish willful misconduct. *See, e.g.*, *Gardner v. Owasco River Ry., Inc.*, 142 A.D.2d 61, 64 (N.Y. App. Div. 1988) (explaining that to prove willful misconduct under the state's general obligations law, a party must show "an intentional act of unreasonable character performed in disregard of a known or obvious risk so great as to make it highly probable that harm would result"); *Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436, 454 (S.D.N.Y. 2003) (discussing the "far higher mark at which New York courts place the bar [for wrongful conduct sufficient as a matter of law to nullify a limitations of liability clause in contract]—demanding nothing short of . . . a compelling demonstration of egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts").

To be sure—as the Circuit observed in *Cynergy*—New York law may be inconsistent as to whether an intentional breach, without more, could ever be sufficient to establish willful misconduct resulting in the non-enforcement of an exculpatory clause. *Compare Noble Lowndes*, 643 N.E.2d at 508 (explaining that a "willful acts" exception to damages immunity under a contract exceeded "mere[] intentional nonperformance of [a contract] motivated by financial self-interest"), *with Banc of Am. Sec. LLC v. Solow Bldg. Co. II*, 47 A.D.3d 239, 247-48 (N.Y. App. Div. 2007) (suggesting that an intentional breach is sometimes sufficient, particularly when a party "with[eld] performance unless the other party agree[d] to some further demand"). But it is settled that at least an intentional breach is required. *See, e.g.*, *In re Lyondell Chem. Co.*, 544 B.R. 75, 88 (Bankr.

S.D.N.Y. 2016) ("New York courts have . . . clarified that to invalidate an exculpatory clause, it is insufficient for the plaintiff to allege or show that the defendant acted with malice or reckless indifference *in the general course of conduct* between the parties.  Rather, the defendant must have acted with malice or reckless indifference *in breaching the contract specifically*.") (citing *Noble Lowndes*).  Moreover, even under the arguably more lenient standard in *Solow*, actions taken out of "legitimate economic self-interest," as opposed to "the intent to inflict economic harm," do not amount to willful misconduct.  *See Solow*, 47 A.D.3d at 250.

In arguing that it has shown willful misconduct, Dana urges the Court to interpret that term as equivalent to "gross negligence."  Opp. MOL at 45-47.  Although this approach has been endorsed by some courts, it is a distinction without much difference.  *See, e.g.*, *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 611 N.E.2d 282, 284 (N.Y. 1993) (defining the "gross negligence" that is necessary to invalidate a contractual limitation of liability as "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing"); *Deutsche Lufthansa AG v. Boeing Co.*, No. 06-CV-7667 (LBS), 2007 WL 403301, at *3 (S.D.N.Y. Feb. 2, 2007) (explaining that "[w]hen the setting is, as here, a contract between two sophisticated parties the conduct must evince a reckless disregard for the rights of others, or be of a kind that smacks of intentional wrongdoing" to nullify a limited liability provision).  Regardless of which precise standard the Court uses here—and, in particular, even if the Court were to agree with Dana that "willful misconduct" as the term is used in the TALA does not require a showing of malice and may be satisfied through gross negligence—none of the conduct of which Dana accuses Lenders meets any of these standards of willful misconduct, because Dana has failed to raise a genuine dispute that Lenders intentionally breached any contract between the parties, or committed any other conduct that amounts to intentional infliction of harm or gross negligence.  *Cf. Shepley*

16

*v. New Coleman Holdings Inc.*, 174 F.3d 65, 72 n.5 (2d Cir. 1999) (explaining that summary judgment is appropriate even if the contractual language is ambiguous when "the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law").[8]

In its Rule 56.1 statement, Dana cites a host of actions and statements by Lenders that purportedly show their intentional breach of the various contracts between the parties and concomitant willful misconduct.  In brief, these actions and statements are either unsupported by the record or are irrelevant to willful misconduct because they do not suggest intentional breaches of any contract, including the TALA.[9]  New York law instructs that without such an intentional breach, a willful misconduct claim cannot lie.  This finding is sufficient to defeat Dana's willful misconduct defense.  Out of an abundance of caution, however, the Court will review each category of alleged conduct that Dana characterizes as "willful misconduct" in its Rule 56.1 statement, many of which are unsupported by the record.[10]

---

[8] Dana relies on *Noble Lowndes*, in which the New York Court of Appeals declined to interpret the term "willful acts" in a contract based on "how we and other courts have construed 'willful' in other contexts, such as in interpreting statutes using that term or in formulating or applying legal principles in tort or contract law," 643 N.E.2d at 506. "Rather," the court explained, the proper course of action was to determine "what the parties intended by 'willful acts' as an exception to their contractual provision limiting defendant's liability for consequential damages." *Id.* But, in the same breath, the court explained that "the law of contracts is pertinent" to answering that question, and when that law was "applied to this contractual dispute" it resolved the issue as a matter of law. *Id.* at 507. So too here: even if there is some ambiguity as to the precise contours of the term "willful misconduct," the Court is able to decide as a matter of law that none of Lenders' alleged conduct falls within any reasonable interpretation of that term.

Moreover, one district court in this Circuit has held that the contractual term "willful misconduct" is not ambiguous, even when the term was not defined in the contract at issue. *See Sabella v. Scantek Med., Inc.*, No. 08-CV-0453 (CM) (HBP), 2009 WL 3233703, at *31 (S.D.N.Y. Sept. 25, 2009) ("The parties to the Escrow Agreement do not define 'willful misconduct.' But there is no suggestion that the term is ambiguous. Accordingly, 'willful misconduct' will be given its ordinary meaning, which is 'Misconduct committed voluntarily and intentionally.' Misconduct is defined as 'A dereliction of duty; unlawful or improper behavior.'") (quoting Black's Law Dictionary (8th ed. 2004))).

[9] Indeed, Ron Dana was unable, during his deposition, to identify a single action Lenders took that breached any of the loan agreements.  PNC's 56.1 Ex. 16 at 96:16-99:5.

[10] Although Dana's Rule 56.1 statement spans over 400 paragraphs, Dana restates each category of Lenders' alleged willful misconduct in paragraph 727 while cross-referencing other portions of its statement; the Court draws from that summary paragraph.

*Allegations That Are Unsupported by the Record*

The Court begins with Dana's assertions that have insufficient factual support to survive summary judgment.  First, Dana argues that Lenders "[w]rongfully, willfully and fraudulently misrepresented to Dana that the 2006 Swap Agreement had to be terminated and a new Swap Agreement . . . had to be entered into in connection with the execution of the Second Amended Loan Agreement," and that this violated 12 U.S.C. § 1972(1), which precludes a financial institution from tying the availability or price of a product or service to the purchase of another product or service offered by the institution.  *See* Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 379-80).  But while the cited deposition testimony could support the proposition that the 2006 swap agreement was terminated because the associated loan agreement was amended, it does not support the proposition that PNC *made any representations* to Dana that the swap agreement had to be terminated for that reason.  And, in any event, any such misrepresentation would be irrelevant to willful misconduct that might implicate the carveout clause in the TALA, a contract that postdated the 2007 swap agreement by two years.[11]

Second, Dana argues that Lenders acted wrongfully in failing to release Ron Dana from his personal guaranty until the loan was paid off.  Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 323, 324, 325, 326, 327, 355, 462, 463, 464).  But both Dana's 2006 and 2007 personal guaranties provided that "[t]his is a continuing irrevocable guaranty and shall remain in full force and effect and be binding

---

[11] *See* LaSala Dec. Ex. F (deposition of PNC employee) at 204:16-205:04 ("Q. If redoing this swap in 2007 was necessary to match the new loan terms, would it also have been necessary to do that in redoing the—in redoing that after the 2009 amendment was put in place? . . . A. I think—I don't think 'necessary' is the word.  It's a client decision based on conversations with the client whether they want to move forward with that or not.  So it would be up to them whether they restructured it as they did in 2007 and whether or not they discussed or contemplated looking at restructuring in 2009."); *id.* Ex. J (deposition of Dana's CFO) at 70:5-14 ("Q. So one of these is a Termination of Rate Swap Transaction dated May 14, 2007, and the other is a Confirmation of a new transaction that day.  Do you have any knowledge of how this came, these documents came to be?  A. My understanding is that they had to terminate the previous one because the loan agreement was amended, there was an amendment done, and they also amended to correspond, the Swap to correspond with that new amendment.").

upon the undersigned . . . until all of the Obligations have been paid in full." Cecchi Dec. Ex. 7 at 6; McTernan Dec. Ex. WF022 at 6. At argument, PNC urged the Court to consider the "totality of the circumstances"—namely, that the initial purpose of the guaranty was to cover a collateral shortfall, and that an internal PNC document stated that the guaranty would remain in place only "until: 1) the Company provides sufficient additional collateral to eliminate the shortfall or 2) a reappraisal of the fleet occurs that illustrates the sub-limit is fully collateralized by existing collateral on hand," Cecchi Dec. Ex. 25 at 9-10—but this extrinsic evidence cannot overcome the plain terms of the guaranties.

Third, Dana's argument that Lenders "[w]rongfully, willfully and fraudulently misrepresented to Dana that the 2007 Swap Agreement had been sold to another counterparty," Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 412, 459), is unsupported by evidence; indeed, a July 2009 email from PNC to Wells Fargo evinces the existence of a third party that was earning income on the swap.[12]

Fourth, Dana's argument that Lenders "[w]rongfully and willfully refused to provide to Dana the $25 million real estate term loan set forth in the [TALA] after the Agent acknowledged in writing that the terms of the Mortgage Delivery Date have been met as defined in the Loan Agreement," Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 616-17), is similarly unsupported. Dana admitted both that it would receive that real estate loan only if PNC had received certain documentation by June 26, 2009, and that Dana had not delivered that documentation by that date. *See* Dana's Counterstatement to PNC's 56.1 ¶¶ 91, 93, 117-21.[13]

---

[12] *See* Cecchi Dec. Ex. 166 at 1 (email from a PNC employee to a Wells Fargo employee explaining: "[T]here is a counter party that chose to take a floating rate when Ron agreed to fix his rate. The swap income that was referred to does not come to PNC. It is the difference between the floating and fixed that Dana owes the other party . . . I have no idea who the counter party is but I am sure I cannot release that information.").

[13] Indeed, when asked, "did [Dana] comply with all of the terms and conditions required for the issuance of a real estate term loan?" Ron Dana answered: "No, because it was part of the scam and I wasn't falling into the trap." Peles

Fifth, Dana asserts that "Wells Fargo, wrongfully, willfully and using underhanded tactics, usurped PNC's role as Agent of the syndicated loan and improperly and negatively impacted Dana's rights under the Remedy provisions of the Second and Third Amended Loan Agreements." Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 445, 466, 472, 474, 484, 486, 568, 608, 635). But, as Lenders rightly note, Dana describes no actions by Wells Fargo that "usurped" PNC's agent role: while Wells Fargo certainly exercised its rights as a participant in the loan facility, including its voting rights with respect to amendments, *see* Cecchi Dec. Exs. 57, 58, 96, there is no evidence that it took any action that only the agent had the authority to take, such as declaring a default. Nor does Dana explain why any such usurpation would have constituted willful misconduct toward Dana, or how any of Wells Fargo's conduct "negatively impacted Dana's rights" under either contract.

Finally, Dana contends that Lenders "[w]rongfully, willfully and fraudulently changed the manner in which Lenders to the Second Amended Loan Agreement treated Ron Dana's personal guarantee by removing the personal guarantee from the borrowing base calculation, thereby instantly creating a collateral shortfall." Dana's 56.1 ¶ 727 (citing *id.* at 376, 433-36, 444-45). Even assuming the guaranty was originally part of the borrowing base, *see* LaSala Dec. Ex. K at 87:08-12 ("Q. [C]an you explain to me how the $14 million guarantee by Ronald Dana was figured into the borrowing base? A. It was a negotiated item as part of the borrowing base."), Dana's cited evidence fails to support the proposition that it was subsequently removed from the borrowing base calculation.[14]

---

Dec. Ex. 2 (Ron Dana Dep.) at 118:22-119:08.

[14] As Lenders note, an email on which Dana relies, in which the author proposes that the personal guaranty would be "boot collateral only," is a draft email that was never sent. *See* Cecchi Dec. Ex. 53.

*Allegations That Do Not Describe an Intentional Breach or Otherwise Suggest Willful Misconduct*

Turning to the conduct Dana describes that may have some support in the record, Dana has failed to meet its burden of showing that it could meet the standard for willful misconduct—or that it is even relevant to that question.  First, Dana reiterates its duress theory by arguing that Plaintiffs "[w]rongfully and willfully charged (or as described by PNC, . . . 'jammed') Dana with exorbitant fees (or as described by BMO as an 'obnoxious interest rate') in order to reap unjust profit from Dana and reduce Dana's liquidity, thereby making harder for Dana to refinance its loan."  Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 652, 697, 711).  But, as discussed in the context of Dana's duress defense, imposing fees and charges on Dana as a condition of certain forbearance agreements or amended agreements following Dana's prior defaults was entirely within Lenders' rights.  Conduct that advances legitimate economic self-interest, even when it is "commercially unreasonable," "self-serving[,] and aimed at maximizing . . . profits," does not constitute "a compelling demonstration of egregious intentional misbehavior."  *Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 545 (S.D.N.Y. 2013) (finding that such allegations did not plead "willful misconduct").[15]

Second, citing a declaration from its expert, Dana argues that PNC "willfully and wrongfully failed to (i) provide Dana with disclosures regarding the . . . [2006 and 2007] Swap

---

[15] Putting the words "obnoxious" and "jammed" in context only reinforces this conclusion.  A March 2011 email exchange among certain Lenders indicated that an over-advance on the TALA would be needed to allow Dana to pay payroll and fuel.  *See* Cecchi Dec. Ex. 203.  In response, one lender wrote that it might be willing to allow such an over-advance, but that if this option were taken, "a meaningful fee would need to be charged, along with an obnoxious interest rate on the [over-advance], to let Ron know we should not be his first option if/when this happens again."  *Id.* Given that Lenders were not obligated to authorize an over-advance in the first instance, the decision to charge high fees and rates in connection with such a discretionary choice does not constitute misconduct.  Similarly, in a January 2013 email, a PNC employee explained that there were likely several outstanding fees to collect from Dana because the lending group had "jammed so many fees on [Dana] the last few extensions and some of them were back ended." Cecchi Dec. Ex. 161.  This is a simple factual narrative, and is not transformed into misconduct through the use of a particular verb.

Agreement[s], (ii) provide Dana with a full explanation of the risks associated with the . . . Swap Agreement[s], and (iii) follow Office of the Comptroller of Currency ["OCC"] guidelines and applicable law before entering into the . . . Swap Agreement[s] with Dana."  Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 311-14, 316-17).[16]  But even assuming that Lenders' conduct in connection with the swap agreements is relevant to "willful misconduct" in connection with the TALA, this argument is belied for at least the 2007 swap agreement, as Dana signed a contract in connection with that agreement in which both Dana and PNC affirmed that each party was "fully informed of and capable of evaluating, and has evaluated, the potential financial benefits and risks" of the transaction and that "[n]either party holds itself out as advising, or any of its employees or agents as having the authority to advise, the other party as to whether or not it should enter into this transaction, and neither party shall have any liability whatsoever in respect of any advice of such nature given, or views expressed, by it or any such persons to the other party."  PNC's 56.1 Ex. 10 at 1.  Separately, Dana fails to explain how failure to follow OCC guidelines or provide full disclosures exceeds ordinary error or negligence—particularly under these circumstances, when Dana was a sophisticated counterparty represented by counsel.

Third, Dana contends that Lenders "[w]rongfully and willfully excluded [vehicle] titles [that comprised Dana's collateral]" during the appraisals, thereby causing Ron Dana's 2007 personal guaranty to be higher than otherwise would have been required.  Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 356-57, 363, 367, 378, 425).  But while there is certainly evidence that titles may have been incorrectly excluded during the third-party appraisals of Dana's collateral that PNC ordered, Dana

---

[16] According to Defendants' expert, PNC failed to follow the OCC's requirements that a bank: (1) have comprehensive written policies and procedures to govern its use of derivatives such as swap agreements; (2) assess a customer's sophistication and familiarity with derivative products before recommending a customer enter into such an agreement; (3) determine whether a derivative instrument is appropriate for a customer; (4) analyze the impact of proposed derivatives activities on the financial condition of the customer; and (5) make sure its counterparty understands the general market risk profile of the derivative transaction.  *See* Kelley Dec. at 2-3.

raises no evidence that this exclusion was intentional, as opposed to inadvertent error.  To the contrary, Ron Dana testified that Lenders' counsel had "forgot[ten]" to provide certain materials to state motor vehicle departments, *id.* ¶¶ 330-31, and a third-party consultant testified that PNC "didn't know" certain details about the collateral "problem" and that neither PNC nor Dana had "a good record on the assets," PNC's 56.1 Ex. 13 (Youngling Dep.) at 156:14-22—suggesting that any appraisal error was due solely to mistake or ordinary negligence.

Fourth, Dana argues that Lenders "[w]rongfully, willfully and fraudulently required Dana to retain" a consultant "under the guise that [it] would assist Dana, but that Lenders "covertly communicated with [the consultant] behind Dana's back in order to accomplish the Lenders' objective of securing a collateral grab from Dana," and that the consultant "charged Dana approximately $1.5 million."  Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 499, 520-22, 525-28, 530-34, 536, 538, 551, 560, 598).  But the terms of the February 2009 forbearance agreement and April 2009 TALA expressly required Dana to hire a consultant, PNC's 56.1 Ex. 14 § 6.12; TALA § 6.13; moreover, Dana interviewed three consultants and hired its choice, *see* McTernan Dec. Ex. WF37 (Ron Dana Dep.) at 95:06-96:12.  As to payment, Dana negotiated the consultant's retainer fee, including a reduction of that fee.  *See* Well Fargo Reply Ex. WF060 (Deseo Dep.) at 260:22-261:1.  Finally, the consulting agreement allowed the consultant to "communicate . . . with representatives of the Secured Lender and other lenders that are participants to the Secured Facility to keep such representatives informed of: (i) the Consultant's progress in performing the Services, and (ii) information relating to the Client and its operations," and further provided that "[t]he Consultant shall keep the Client apprised of such communications, and to the extent practicable, will consult with the Client regarding any such communications prior to such communication."  Cecchi Dec. Ex. 132-A at 6; *see also id.* Ex. 105 at 5.  At best, Dana has established that the consultant failed

to keep Dana apprised of communications—but that speaks to the consultant's conduct, not Lenders'.

Fifth, Dana asserts that "Wells Fargo wrongfully and willfully cut off credit for related (non-borrower) [Dana] entities . . . that separately had been lent funds by Wells Fargo in order to improperly push Dana towards bankruptcy."  Dana's 56.1 ¶ 727 (citing *id.* ¶ 432).  Although Ron Dana's deposition testimony supports this statement, *see* LaSala Dec. Ex. A (Ron Dana Dep.) at 46:6-47:16, Dana fails to establish how such conduct was not authorized under the various loan agreements following its repeated defaults.

Finally, Dana faults Lenders for rating Dana a "credit risk" following its defaults, conditioning the January 2013 payoff letter on agreeing to a release, and increasing Dana's monthly amortization payment after Dana made the last payment on the 2007 swap agreement, Dana's 56.1 ¶¶ 727-28 (citing *id.* ¶¶ 572, 666-68, 673, 700-02, 711-12, 714-15)—but, once again, it does not explain how any of these actions breached any agreement or were otherwise wrongful.

Having exhausted the substance of the evidentiary record, Dana turns to rhetoric, pointing to various communications in which Lenders expressed disapproval of other Lenders' conduct in connection with the loan agreements, or in which Lenders used certain language when discussing their options under the loan agreements.  *See, e.g.*, Cecchi Dec. Ex. 123 (email from PNC employee, in response to Wells Fargo's request that PNC impose the default rate when Dana's real estate fair market value came in at $8 million rather than $12 million, that stated: "[D]efault rate for side collateral values.  These people are unreal."); *id.* Ex. 163 (email from third-party consultant explaining that "Ron [Dana] thinks the banks screwed him" on certain terms in the TALA and commenting that "[h]is view is not without some merit"); *id.* Ex. 96 (email from Wells Fargo employee explaining that a PNC employee had "suggested" that Lenders "were putting a gun to

Ron Dana's head" through the negotiations on the 2009 forbearance agreement and TALA).  Dana provides no support, however, for the inference that "hard bargaining" of this sort rises to the level of willful misconduct.  *Cf. Interpharm*, 655 F.3d at 145.

## III.   Dana Has Failed to Raise a Genuine Issue of Material Fact on Its Other Affirmative Defenses

In opposing summary judgment, Dana relies on several additional affirmative defenses: lack of consideration for the payoff letter; fraud and fraudulent inducement; public policy; unconscionability; and violation of the covenant of good faith and fair dealing.  None of these defenses shield Dana against summary judgment.[17]

First, the validity of the January 2013 payoff letter is irrelevant, as Dana's indemnification obligation arises from the TALA and "survive[s] termination of" that contract.  TALA § 16.7.

Second, Dana's fraud defenses fail because it has not identified any material false representation by Lenders on which Dana relied in connection with the TALA.  Again, although Dana contends that Lenders' assertions that Dana defaulted on the Second Amended Loan Agreement were based on a "miscalculation," it produces no evidence that such miscalculation constituted an intentional misrepresentation, or that Dana attempted to disabuse Lenders of any such mistake before entering the TALA.  Further, to the extent Lenders may have erred in appraising the value of Dana's collateral or in failing to disclose the full risks of the swap agreements, Dana has failed to establish either that these constituted intentional misstatements or that Dana relied on those misstatements in executing the TALA.

Third, New York's public policy regarding limitations of liability under these circumstances is already encompassed in the state's willful misconduct doctrine.  *See, e.g.*, *Austro*

---

[17] To the extent Dana continues to rely on its other affirmative defenses in opposing summary judgment, each of those defenses fail for the reasons stated in Lenders' motions.

*v. Niagara Mohawk Power Corp.*, 487 N.E.2d 267, 267 (N.Y. 1985) (explaining that indemnification agreements "are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury"); *accord Noble Lowndes*, 643 N.E.2d at 509 (clarifying that "limiting . . . liability for consequential damages to injuries . . . caused by intentional misrepresentations, willful acts and gross negligence does not offend public policy"). That is, the Court's finding that Lenders have not committed willful misconduct is consistent with New York's public policy on indemnification agreements.

Fourth, Dana has failed to rebut the "presumption of conscionability" that arises "when businessmen contract in a commercial setting," largely for the reasons expressed above. *Am. Tel. & Tel. Co. v. N.Y. City Human Res. Admin.*, 833 F. Supp. 962, 989 (S.D.N.Y. 1993).

Finally, there is no evidence that Lenders breached the covenant of good faith and fair dealing in connection with the TALA. The covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). Dana has not asserted that it failed to receive the fruits of the TALA, namely, continued funding, or that Lenders' actions "directly violate[d] an obligation that may be presumed to have been intended by the parties" in executing the TALA, *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407-08 (2d Cir. 2006). Rather, it argues only that Lenders effectively eliminated the benefit of the 2007 swap agreement's interest rate by imposing a certain Libor floor on the interest rate set out in the TALA, thus "double billing" Dana. *See* Opp. MOL at 62-63. Even if true, however, this did not affect Dana's receipt of benefits from the *TALA*: the additional interest Dana was compelled to pay under the TALA was clearly contemplated by that contract, and Dana does not argue that it did not receive a benefit it was promised under the TALA, such as continued

funding.[18]  At best, Dana contends that Lenders exercising their rights under the TALA lessened the benefits Dana hoped or expected to receive from another contract.  Nonetheless, it is well settled that the covenant "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from [a] contract." *Thyroff*, 460 F.3d at 408.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions for partial summary judgment are granted. Within two weeks from the date of this Order, the parties shall submit a joint letter proposing next steps in this action.

The Clerk of Court is respectfully directed to terminate the motions at docket numbers 151, 157, 161, and 189.

SO ORDERED.

Dated: August 26, 2022
New York, New York

_____
Hon. Ronnie Abrams
United States District Judge

---

[18] Indeed, internal PNC communications show that PNC employees consulted with each other to confirm that the higher interest rate Dana would pay following the TALA was proper, belying any inference of bad faith.  *See* Cecchi Dec. Ex. 151 (PNC employee explaining: "Dana pays Business Credit its all-in rate of 7.25% (LIBOR floor of 3% plus 4.25% spread) on the entire outstanding loan balance.  On the notional amount of the swap, $116MM, Dana pays a fixed rate of 5.17% less the current 30-day LIBOR floating rate, .43%, for an all-in swap rate of 4.74%.  The 7.25% to Business Credit, plus the 4.74% for the swap equals 11.99% or 12%, as the company indicated.  *I had [another PNC employee] confirm this several times as I inquired if this equated to a double charging of the interest on the notional amount.*  He said this was how the swap contract works.") (emphasis added).